# Exhibit 4

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. 0:13-cv-60721-FAM

IRA MARC FLADELL, SARAH CROUCH,
GREG OLSON, MARGARET
ZAWISTOWSKI, TILENA ALI, DANNY
LANE and BEVERLY LANE on behalf of
themselves and all others similarly
situated,

    Plaintiffs,

v.

WELLS FARGO BANK, N.A., et al,

    Defendants.

VIDEOTAPED DEPOSITION OF AMIRALI JABRANI

Taken on behalf of the Plaintiffs

November 10, 2014

(Whereupon, the deposition began at 10:01 a.m.)

## Page 2

INDEX OF EXAMINATION

Page

Questions by Mr. Moskowitz.......................... 5

INDEX OF EXHIBITS

| | | |
|---|---|---|
| Exhibit No. 1 | three agreements................ | 20 |
| Exhibit No. 2 | notes.......................... | 28 |
| Exhibit No. 3 | order.......................... | 37 |
| Exhibit No. 4 | settlement agreement........... | 38 |
| Exhibit No. 5 | settlement agreement........... | 40 |
| Exhibit No. 6 | objection...................... | 47 |
| Exhibit No. 7 | objection...................... | 48 |
| Exhibit No. 8 | pleading....................... | 56 |

## Page 4

APPEARANCES

For the Plaintiffs: By Mr. Adam M. Moskowitz
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 Ponce De Leon, 9th Floor
Coral Gables, Florida 33134
Tel: 305-372-1800 / Fax: 305-372-3508

By Lance A. Harke
HARKE CLASBY & BUSHMAN, LLP
9699 NE SECOND AVENUE
MIAMI, FL 33138
Phone: 305-536-8220

LOCAL COUNSEL: By Mr. Peter Woods
Law Offices of Haar & Woods, LLP
1010 Market Street, Suite 1620
St. Louis, Missouri 63101
(314) 241-2244

The Court Reporter: Ms. Angie Kelly, CSR/CCR
Missouri CCR No. 1010 Illinois CSR No. 084-004498
Midwest Litigation Services
711 North Eleventh Street
St. Louis, Missouri 63101
(314) 644-2191

The Videographer: Mr. Dave Willman

## Page 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 0:13-cv-60721-FAM

IRA MARC FLADELL, SARAH CROUCH,
GREG OLSON, MARGARET
ZAWISTOWSKI, TILENA ALI, DANNY
LANE and BEVERLY LANE on behalf of
themselves and all others similarly
situated,
    Plaintiffs,
v.
WELLS FARGO BANK, N.A., et al,
    Defendants.

DEPOSITION OF WITNESS AMIRALI JABRANI produced, sworn, and examined on the 10th day of November, 2014, between the hours of 10:01 in the morning and 11:29 in The morning of that day, at the offices of Haar & Woods, LLP, 1010 Market Street, Suite 1620, St. Louis, Missouri 63101, Before ANGIE KELLY, a Certified Court Reporter within the United States District Court, Southern District of Florida, Wherein Ira Fladell, et al is the Plaintiff, and Wells Fargo Bank, et al are the Defendants.

## Page 5

IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the Plaintiffs and counsel for the Defendant, that the deposition of AMIRALI JABRANI may be taken in shorthand by Angie Kelly, a Certified Shorthand Reporter, and afterwards transcribed into typewriting; and the signature of the witness is expressly NOT waived.

* * * * *

AMIRALI JABRANI,
Of lawful age, being produced, sworn and examined on behalf of the Plaintiffs, deposes and says:

EXAMINATION

QUESTIONS BY MR. MOSKOWITZ:

THE VIDEOGRAPHER: We are on the record. Today's date is November 10, 2014 and the time is 10:01 a.m. This is the videotaped deposition of Amirali Jabrani in the matter of Fladell verses Wells Fargo Bank. This deposition is being held at 1010 Market Street, St. Louis, Missouri. I'm the videographer. Will the attorneys present please introduce themselves?

MR. MOSKOWITZ: For the plaintiffs, Adam Moskowitz and Lance Harke.

MR. HARKE: Morning.

MR. WOODS: Morning. My name is Pete Woods. I'm here

Page 6

1  on behalf of both of the Jabranis and for the record, I'm here
2  solely as local counsel. I have not entered my appearance on
3  either the Wells Fargo or SunTrust Mortgage cases and do not
4  anticipate doing so.
5       (Witness sworn)
6    Q. (By Mr. Moskowitz) Good morning, Mr. Jabrani.
7    A. Good morning.
8    Q. My name is Adam Moskowitz I'm here with Lance my
9  friend and co-league counsel on these cases. Thank you very
10 much for you and your wife for coming here today.
11   A. My pleasure.
12   Q. I know you've been deposed before, I just read one
13 transcript. So just to let you know, I'm going to ask you
14 questions, you swore under oath like you're in a court of law.
15 Don't feel -- this shouldn't be a bad experience, I'm just going
16 to ask you questions about what you did, what you objected to,
17 try to understand what your concerns are. We are co-league
18 counsel for the class and we're trying to talk with a lot of
19 class members to find out if there's problems, if there's issues
20 and find out what they are.
21   A. Okay.
22   Q. What is your home address?
23   A. 2038 Moondance, one word M-O-O-N-D-A-N-C-E Moondance
24 Court, O'Fallon, Missouri.
25   Q. Is that the address where you were force placed

Page 7

1  insurance or is it a different address?
2    A. It was at the same address.
3    Q. That same address. Was it your decision to file the
4  objection, was it your wife, was it a group decision, how did
5  that come about?
6    A. We both decided to file an objection.
7    Q. Do you know how much you think you were overcharged by
8  these insurance companies for forced place insurance?
9    A. I have no idea. At this point I have no idea.
10   Q. Have you ever talked to them about your issue, your
11 forced place coverage? Who were you force place by.
12   A. Wells Fargo as well as SunTrust.
13   Q. Okay. Do you know who the insurance company was,
14 those are the banks, what about the insurers?
15   A. Insurance company I had State Farm initially and then
16 I switched over to St. Charles Insurance Company, which a broker
17 company.
18   Q. Do you know which insurance company actually force
19 placed you insurance?
20   A. No.
21   Q. Okay. Have you ever tried to find out who charged you
22 insurance?
23   A. I did get a statement if I can recall, saying you'll
24 be charged extra money for forced placed LPCs or LPIs for forced
25 placed insurance. I did get a statement some kind of thing from

Page 8

1  SunTrust or Wells Fargo or I could have received it from my
2  insurance broker that St. Charles Insurance Company.
3    Q. Did you pay those amounts?
4    A. Yes.
5    Q. The do you know you much that was?
6    A. No idea.
7    Q. Did you ever ask them to explain why you were forced
8  place, did you lapse your coverage, did you forget to pay?
9    A. No, I never lapsed coverage.
10   Q. Why were you force placed?
11   A. I was with St. Farm Insurance then St. Farm Insurance
12 policy had gone up tremendously, I wanted to shop around. I
13 shopped around with St. Charles Insurance and came up with a
14 better price, so I decided to go that route.
15   Q. Why were you force placed insurance?
16   A. There may be a lapse, not having the coverage, lapse
17 of giving information to SunTrust or Wells Fargo or Chase,
18 whoever the insurance company was maybe the lapse in getting
19 information sent to them.
20   Q. Okay. How much more was the lender place insurance
21 verse what you were paying previously, do you know if it was
22 more, less?
23   A. I have no idea.
24   Q. So do you know if you were unfairly overcharged?
25   A. I feel like I was unfairly overcharged.

Page 9

1    Q. Why if you don't know the numbers?
2    A. Because it say in the statement form that you were
3  getting charged so much money extra because of the lapse in
4  insurance, which I didn't have a lapse of insurance not for a
5  single minute.
6    Q. Did you ever ask for that money back?
7    A. I did call both the companies SunTrust as well as
8  Wells Fargo as well as the couple other companies because the
9  information that may have gone out from Chase Insurance -- I
10 mean from St. Charles Insurance Company to mortgage companies to
11 ask for the money back and never received the call, they say
12 that's the way it is.
13   Q. Do you want the money back?
14   A. Now, we got a claim, you know, objection we filed
15 objection and everything. I would like to make sure that the
16 whole class action members get the right amount.
17   Q. So you want us to win, you want the class action to
18 win?
19   A. Class action members to win?
20   Q. Right.
21   A. Yeah.
22   Q. But you've objected to the settlement, how do you want
23 it to be changed?
24   A. There are several reasons why I want to get it
25 changed. If you look at the objections and things the

Page 10

1 information they've read through different is it a different
2 places and from the forms there are several reasons why, first
3 of all, the claim process itself, the settlement process itself
4 is not fair, adequate and easy.
5   Q.  The claims process is not fair?
6   A.  Settlement process is not fair itself, the process
7 itself is not fair.
8   Q.  Why?
9   A.  Because, first of all, there's low number of filing
10 and they have to go on site, Wells Fargo site to fill out an
11 application form I mean the claim for.
12   Q.  Your claims numbers are low?
13   A.  Because the number of filing by the claimants would be
14 low because you have to go on the Wells Fargo site that is
15 determined by Wells Fargo, you go on their site and fill out an
16 application form or claim for.
17   Q.  Why do you have to go on their site, you didn't get
18 one mailed to you?
19   A.  That was that form, I'm talking about for the
20 settlement money that will be dispersed.
21   Q.  Right. Do you know that people were mailed claim
22 forms?
23   A.  Yeah.
24   Q.  So you don't have to go on the site to get the form?
25   A.  Okay.

Page 11

1   Q.  So you're mailed the form, and what's wrong where
2 that?
3   A.  Besides that one, once the judge gives the final
4 approval, the court gives the final approval then they have to
5 go on the website form, I mean Wells Fargo site which is you
6 have to fill out all the application form go through the whole
7 process which would become people get confused and some of them
8 will say forget it, I don't want to go it.
9   Q.  Did you fill out a claim form?
10   A.  On the computer, on-line.
11   Q.  However, did you submit a claim for Wells Fargo and
12 SunTrust?
13   A.  Yes.
14   Q.  Was it a difficult process?
15   A.  I made a mistake.
16   Q.  Okay.
17   A.  I made a mistake and I had to rectify by sending them
18 again.
19   Q.  So what should have been done?
20   A.  Should have been a lot more easier, lot more easier
21 process.
22   Q.  How?
23   A.  I don't know, I don't know, I'm not I'm just a regular
24 laymen guy.
25   Q.  Right, but you're saying you have to go on and you

Page 12

1 check a box and you fill out your name and information, what
2 could have been done to make it much better?
3   A.  I don't know, I don't know every person, I have
4 master's degree and still I made a mistake, that tells me that a
5 person like me can make mistake, a layman can make mistake too.
6   Q.  Right, but do you have any suggestions or ideas how
7 the claim form itself could have been better?
8   A.  No, I have no idea.
9   Q.  How about the process of filling it out, do you have
10 any specific suggestions how it could be better?
11   A.  No, no, you a guys are class action pros, how would I
12 know.
13   Q.  You said that you fixed the mistake you made, how did
14 you know you had a mistake?
15   A.  I just read it again one more time and then I found
16 out okay, this question meant so-and-so, not so-and-so, so at
17 that time I had to rectify it.
18   Q.  Do you -- did you check that you actually made a
19 payment or that you just were charged, do you remember?
20   A.  No, there were two questions, one was I put down no on
21 both of them, I don't remember exactly, whether we made a
22 payment or we were charged or everything, I put down no and yes,
23 the second one was yes, because they did charge me, and that's
24 how the application claim form came to me.
25   Q.  So you actually were charged and you made a payment on

Page 13

1 it?
2   A.  No, I didn't. Payment was done through the insurance
3 company or --
4   Q.  They took it from you?
5   A.  Yeah, took it.
6   Q.  Okay.  Are you hoping to get money back?
7   A.  Hopefully I'll get everything back and more, if I need
8 to get more, whatever the thing is.
9   Q.  How would you get more?
10   A.  Whatever the process is, you know, if the claim
11 process is for example you're getting X amount of money, I'm
12 getting X amount of money, whatever the process is.
13   Q.  Do you know how much you're getting under the current
14 settlement with Wells Fargo and SunTrust?
15   A.  Right now, it says I don't know exactly how much.
16   Q.  Do you have a problem with that specific amount,
17 should that amount in your opinion be more or less?
18   A.  I know the claim amount number is $285 million for the
19 whole lawsuit, Wells Fargo.
20   Q.  That's going to be made available to the class?
21   A.  That is under the class.
22   Q.  Okay.
23   A.  That includes attorney fees, class representatives and
24 the class members.
25   Q.  Is that okay?

5 (Pages 14 to 17)

**14**

1  A. Guess so.
2  Q. You don't know?
3  A. I don't know.
4  Q. And SunTrust, is the amount that's being made
5  available to the class is that okay?
6  A. I don't how much that would be, I don't know.
7  Q. Okay. So you just think that the claims process
8  should be different?
9  A. It should be more easier, less cumbersome, should not
10 be going through Wells Fargo website and that kind of thing.
11 Q. Anything else that you specifically have as a problem
12 with either Wells or SunTrust?
13 A. Both of them, I mean, I don't know, I got a little
14 confused between Wells Fargo and Hamilton, because it's pretty
15 much so similar in the notion so, other second issue is on the
16 same thing on settlement process, we don't know how many members
17 would file the claim, okay, you guys are saying it will be 19,
18 20 percent or so, and historically if you look at it, because
19 it's so cumbersome, the percentage that is given out, the
20 percentage of money that is given out through the claim process
21 is 7 percent, 6 to 7 percent not 19 to 20 percent.
22 Q. Who says 19 to 20 percent?
23 A. I don't know exactly, but I read somewhere, I don't
24 know exactly but that's where I found you know, the amount is a
25 lot higher.

**15**

1  Q. But you think that somebody said it would be 20
2  percent?
3  A. No, I'm not saying 20, it would be a lot higher.
4  Q. Okay.
5  A. The claims would be a lot higher, that's the we're
6  saying, the percentage of the money that is given out would be a
7  lot higher.
8  Q. You say they, who says that?
9  A. From the forms that I read.
10 Q. You think somewhere in the forms it gives a number
11 of --
12 A. It doesn't give a number, but it says a lot higher
13 percentage.
14 Q. So you think it's going to be around 7 percent?
15 A. Historically it should be 6 to 7 percent.
16 Q. And what's wrong that with that, what's your objection
17 on that?
18 A. Objection should be that you guys, it historically
19 should be 6 to 7 percent, which the amount will be less than $20
20 million, not the amount that you are saying, because you are
21 projecting that it will be 18, 19, 20 percent.
22 Q. So how does it affect Mr. Jabrani if it's 6 percent of
23 the people decide to fill out claims, how does that hurt you?
24 A. I doesn't hurt, I want to be fair, see the whole
25 objection of this thing is not for me to pocket all the money,

**16**

1  it's for fairness and reasonable and equitable to all the class
2  members, not only just Jabranis.
3  Q. So if the amount of people that decide to send in
4  claims is 6 percent, how does that hurt the other class members?
5  A. How does it hurt other class members? Because other
6  people will be left out.
7  Q. But you're saying the amount that people get, that's
8  fair, you don't have a problem with the actual amount, whether
9  it's 12.5 percent or 10 percent in terms of what they get back?
10 A. No, I'm not saying, the percentage, how can you be
11 sure on that one too, the amount you are saying you have
12 overcharged 18, 20 percent, from what I gather, 18 percent, 19
13 percent you have overcharged.
14 Q. Where's that from?
15 A. I just read all that stuff, little bit here and there
16 as I told you, I went through all the documents, you know, read
17 the settlement here and there, and this is my notes that I have
18 taken down, now, and you charged them 18 percent and you're
19 willing to give --
20 Q. Whose you?
21 A. As plaintiffs, plaintiff's attorneys, okay, that Wells
22 Fargo would give out 18 to 20 percent, I mean 10 percent, sorry,
23 10 percent.
24 Q. I'm sorry, Wells Fargo is going to give 10 percent of
25 the insurance money back to the plaintiffs?

**17**

1  A. You collected, overcharged the claimants, okay.
2     MR. WOODS: Ali, you're getting confused, they
3  represent the claimants here.
4  A. Okay.
5     MR. WOODS: They don't represent Wells Fargo or
6  SunTrust.
7     MR. MOSKOWITZ: We represent the class members like
8  you.
9     MR. WOODS: And that's where Wells Fargo and Trust,
10 you're talking about the insurance percentages, I believe, I
11 don't want to prompt you.
12 Q. (By Mr. Woods) Let's walk through this. How did you
13 hear about this case, how did you first hear about it, did you
14 get a notice in the mail?
15 A. I got a notice in the mail.
16 Q. So you opened up the notice?
17 A. Yeah.
18 Q. And what did you do? Did you call your lawyer when
19 you opened it?
20 A. No, what I did was I went to the computer, looked at
21 what the case was all about, okay.
22 Q. Which one is this, the Wells Fargo?
23 A. First I got Wells Fargo, so I went and looked at it.
24 Q. Where did you go, onto the website?
25 A. Website.

800-726-7007                                                      305-376-8800

Case 2:13-md-02439-LA  Filed 01/07/16  Page 6 of 10  Document 57-4

**Page 18**

1  Q. The settlement website or the Wells Fargo website?
2  A. Wells Fargo website, or settlement website, I don't
3  know exactly which one it was.
4  Q. Okay.
5  A. And got a little summary as to what it was, and then I
6  decided okay, hey, I do have a case here, and I said let me
7  approach the attorney, which is Chris.
8  Q. Oh, your attorney.
9  A. My attorney, and see what he thinks about and get his
10 idea on it, take on it, and that's what we decided to go with
11 Chris Bandas.
12 Q. Okay, so you called -- was he your lawyer on another
13 case?
14 A. He was any lawyer on another case.
15 Q. As an objector in a class action?
16 A. Not as an objector.
17 Q. How many times have you objected in class action
18 settlements?
19 A. Just one time.
20 Q. So he was your lawyer in that case, you called him up
21 and said what?
22    MR. WOODS: Well, I'll going to object to any
23 conversations specific to the Chris Bandas conversations as
24 protected by attorney-client privilege.
25 Q. (By Mr. Moskowitz) Okay. Did you call us, did you

**Page 19**

1 ever call the people that were designated by the court to be
2 your lawyers, class counsel?
3 A. I called, if I remember correctly, I called the class
4 action members too, lawyers too, don't know who the person was,
5 I left a message, I remember calling and guess what, the message
6 was left, I never received a call.
7 Q. Do you know what state did you call?
8 A. Whatever the number that was given on there, to the
9 class members.
10 Q. On the notice?
11 A. On the claims form.
12 Q. On the claims form. Did you call the claims
13 administrator?
14 A. I have no idea, I don't know exactly, I never received
15 a call.
16 Q. Okay. And then you called Chris Bandas, you say I got
17 this notice, I'm not going to ask you what you guys exchanged,
18 and then you decided to object to the settlement or did you want
19 to find out more details about the settlement?
20 A. I decided after probing the information, I decided to
21 hire him as general counsel for me.
22 Q. What is general counsel, as your lawyer?
23 A. As a lawyer.
24 Q. Okay. Now do you pay Mr. Bandas?
25 A. No.

**Page 20**

1  Q. Okay. Let's mark as composite Exhibit 1 three
2  agreements that we were handed when we got here, kindly by
3  counsel.
4     (Exhibit 1 marked for identification)
5  Q. (By Mr. Moskowitz) We've marked as composite Exhibit 1
6  three agreements, one is dated October 28, 2014 that's a letter
7  from Mr. Jabrani to Horan Woods in the SunTrust matter, the
8  second one is dated October 28, 2014 in the Wells Fargo matter,
9  and there's a third agreement I believe with Mr. Jabrani and
10 Chris Bandas. Is this third agreement, is this what you're
11 talking about you hired Mr. Bandas?
12 A. Yes.
13 Q. And do you pay Mr. Bandas to be your lawyer?
14 A. No, I don't pay, if you read that agreement, it tells
15 you exactly.
16 Q. I just got it, so.
17 A. If you read the agreement, it will tell you exactly
18 what the agreement is.
19 Q. Do you have to pay?
20 A. No, I don't have to pay.
21 Q. Do you pay any costs to him?
22 A. No.
23 Q. And you don't pay any fee to him?
24 A. No.
25 Q. What do you get out of being an objector?

**Page 21**

1  A. A fair settlement, class action for all the class
2  members.
3  Q. Okay. And what else does Mr. Jabrani get, anything
4  else?
5  A. That's what the main object is.
6  Q. Right, but what can you stand to benefit from
7  objecting in these cases?
8  A. I don't see any more on that one, besides being fair
9  to the class members.
10 Q. Could you get something called an incentive award?
11 A. Yeah, if there's an incentive award, I will get an
12 incentive award.
13 Q. Okay, I just want to make sure what you get out of
14 this agreement.
15 A. Yeah, if there's an incentive award, yeah.
16 Q. And how much is that?
17 A. It doesn't specify.
18 Q. It says you understand any incentive award or payment
19 sought will never exceed $5,000, why is that, do you know? Did
20 you see that there, it says that there under 3.2, did you talk
21 about that with Mr. Bandas?
22    MR. WOOD: Well, again, I'm going to object to any
23 conversation with Mr. Bandas as being protected by the
24 attorney-client privilege and instruct the client not to answer.
25 Q. (By Mr. Moskowitz) Okay. There's an agreement here

**Page 22**

1  that mentions a $5,000, are you aware that you may recover any
2  amount of money as an incentive award period?
3     A.  If that's the case, yeah, I will get $5,000, whatever
4  this contact says.
5     Q.  Why would you get an incentive award if you object,
6  that's what I'm trying to understand?
7     A.  Well --
8     Q.  You're not a named plaintiff in this case, so how do
9  you get --
10    A.  I am a named plaintiffs, I am a claimant member, claim
11 member.
12    Q.  You understand in class actions, if a class action is
13 approved, as part of the case the court may award the named
14 plaintiffs who took the case, who were deposed, who produced --
15    A.  Class representatives.
16    Q.  Class representatives get incentive awards.
17    A.  Okay.
18    Q.  So how would you get an incentive as an objector?
19    A.  I'm not asking, if that's what he's taking the case
20 you know, and he's awarding me $5,000, I will take $5,000,
21 whatever it is.
22    Q.  Who's that from, from Mr. Bandas will give you $5,000?
23    A.  Could be anything, whatever it says there.
24    Q.  I want to know your understanding.
25    A.  It could be anybody, it could be Wells Fargo, it could

**Page 23**

1  be you, it could be Chris Bandas, it could be anybody, I don't
2  know exactly.
3     Q.  It could be anybody that's going to give you $5,000?
4     A.  Yeah.
5     Q.  And that's one reason why you're filing the objection?
6     A.  No, one of the biggest reason, is let me be very clear
7  on that one.
8     Q.  Sure.
9     A.  The biggest reason is fairness, reasonableness okay,
10 of all the class members, not just the attorneys or the class
11 representatives, all who are not even present.
12    Q.  Okay.  So out of the 700,000 or so SunTrust class
13 members, do you know how many people have objected to the
14 settlement?
15    A.  No, I believe I am one of them, I know that.
16    Q.  Do you know if you're the only one?
17    A.  I could be the only one, I could be the only one.
18    Q.  Okay.  So you're the only one that you believe thinks
19 that somehow the process is not fair?
20    A.  Yeah.
21    Q.  And you're saying it's not fair because it should be
22 easier?
23    A.  It should be easier, less complicated.
24    Q.  But you don't know how?
25    A.  Once again, I'm not an attorney, I've never filed a

**Page 24**

1  class action lawsuit, and I'm not a lawyer, so I would not know
2  what the process is, I would not know what forms to fill out,
3  you guys are pros on that.
4     Q.  You don't know how it could be better?
5     A.  I don't know.
6     Q.  Is there anything else we talked about the incentive
7  awards, you may get $5,000, is there anything else that you
8  would get?
9     A.  I don't know, I don't know.  Not that I know of, but
10 could be anything, I mean, you know, I may get recoup all the
11 money, what it is, I don't know exactly.
12    Q.  Like all the other class members?
13    A.  Like all the other class members.
14    Q.  Is there anything else this Mr. Jabrani would get
15 specially besides what the class would get?
16       MR. WOODS:  Objection calls for speculation.  If you
17 know the answer, go ahead.
18    Q.  (By Mr. Moskowitz) If you know.
19    A.  I don't know.
20    Q.  Well an incentive order is one, that would be
21 different than the other 700,000 people?
22    A.  Yes.
23    Q.  If your lawyers get money, do you share at all in any
24 of that money?  If they're awarded a million dollars as an
25 attorney fee, would you get a dollar of it or anything?

**Page 25**

1     A.  Does it say on that one?
2     Q.  I haven't read the whole agreement.
3     A.  Read it, I don't know, I mean, I don't know, I don't
4  know.
5     Q.  You don't know what you get?
6     A.  No.
7     Q.  The other two agreements that we've marked dated
8  October 28, did you sign these with Horan Woods?
9     A.  Yes.
10    Q.  And what is this for?
11    A.  This is for he representing me in this deposition
12 section.
13    Q.  And it's billed at a rate of $375 an hour?
14    A.  Yes.
15    Q.  Who pays that?
16    A.  Chris Bandas.
17    Q.  You don't have to pay?
18    A.  I don't, because it's specified in that contract.
19    Q.  And is this how you did it in the prior case where you
20 were an objector, you didn't have to pay any hourly fee?
21    A.  No.
22    Q.  There's a fourth agreement we just don't have here
23 between you and Mr. Bandas for the Wells Fargo case?
24    A.  Yes.
25    Q.  To be signed?

Page 26

1  A. Yes.
2  Q. Did your wife sign these as well?
3  A. Yes.
4  Q. And it's the same agreement?
5  A. Yes. That was somewhat, a lot more issues too.
6  Q. I'm sorry?
7  A. There were a lot more issues that you talked about, you know, why you were objecting.
9  Q. Okay. Thank you.
10 A. The other one is the injunction. You know, they're making a big deal that it's a big injunction, is a big plus for the class members, and it's not, it's still very unfair because Wells Fargo, their injunction is for the future process, future process of doing things like business, okay, not for the present members, it's not helping the present members.
16    Second thing is they're talking about is what happened was they got caught in the cookie jar. Now anybody that had to stop doing the same practice, because otherwise guess what, they would get slapped again with another lawsuit.
20 Q. Okay.
21 A. And the last thing that I want to talk about is that prohibition of the same practice is for five years.
23 Q. Okay. So you read the settlement agreement, Mr. Jabrani yourself and you figured these three things yourself?

Page 27

1  A. No.
2  Q. Or did you talk to an expert?
3  A. Expert, would talk to an expert you take counseling you look at objections, you talk to --
5  Q. No, no, no I mean Mr. Jabrani, you?
6  A. Uh-huh.
7  Q. Explain again, you went on the Internet website you printed out the settlement agreement?
9  A. No, I didn't print out the settlement, that was just a summary I read.
11 Q. Okay.
12 A. But then I got the settlement, correct.
13 Q. From who?
14 A. From counsel.
15 Q. From Mr. Bandas?
16 A. Could be anybody, okay, but I did get settlement from him.
18 Q. You got the actual agreement?
19 A. Yes.
20 Q. Did you read it yourself?
21 A. I browsed through it myself.
22 Q. How long did you spend on it, a couple weeks or a couple minutes?
24 A. Couple of hours.
25 Q. Couple of hours, did you talk to any experts yourself?

Page 28

1  A. Yeah.
2     MR. WOODS: Other than conversations you may have had with your attorneys.
4  A. Okay, no.
5  Q. (By Mr. Moskowitz) Okay. So you were sent the settlement agreement, you talked about it, I don't want know the details of what you and your lawyers said about the settlement agreement, and then you came to the conclusion that these three incentive relief insures are a problem?
10 A. Yes. There are other ones too, if you want I can tell you some more, but.
12 Q. Oh, sure, I want to hear them all today.
13 A. Okay.
14 Q. The first one you think is it's not going to help Wells Fargo, it's going to be in the future so it won't help present members?
17 A. Yeah, the process, I've got notes written down too, what it is.
19 Q. What were those notes from, a conversation?
20 A. From objections, you know, reading objections.
21 Q. Are these from a conversation with your lawyer?
22 A. No, I mean, things that I put down, lawyers taking his advice, taking everybody's advice, reading objections and filling out my own form, this is all mine.
25 Q. Okay. So who else besides counsel did you talk to to

Page 29

1 generate those notes?
2  A. No, nobody else.
3  Q. Just your counsel?
4  A. Just my counsel, objections that I read, the settlements that I read, everything, and that's how I created my notes.
7  Q. Okay. Can we mark that as an exhibit?
8  A. Sure.
9  Q. I'll mark it as Exhibit 2. So the only people you talked to about your objections is your counsel?
11 A. Counsel, yeah.
12 Q. Because you keep saying and other people I just want to make sure.
14 A. Paperwork I'm talking about, I never said other people. I said other forms and paperwork that was given to me.
16 Q. By counsel?
17 A. By counsel.
18 Q. Okay. What's the other, the settlement agreement?
19 A. Settlement objections.
20 Q. Your objections?
21 A. My objections.
22 Q. Because nobody else objected?
23 A. My objections.
24 Q. Did you draft your objection or did your counsel draft?

**30**

1   A.  Nobody draft the objections.
2   Q.  The objections you filed in this these cases.
3   A.  Uh-huh.
4   Q.  Did you a type them up?
5   A.  Oh, draft it, okay, no I didn't draft it, I did not.
6   Q.  So what did you do in terms of the objections, did you
7   dictate a message, did you send an e-mail to your lawyer?
8   A.  I brought a consent to him and he's the pro at that
9   business, so I said okay, you whatever you say, I'll go with.
10       MR. WOODS:  Again I'm going to object to any
11  conversation you had with your attorneys.  I don't want you
12  testifying about anything that you said to an attorney or an
13  attorney said to you or written communications to or from your
14  attorneys.
15  A.  Okay.
16       MR. WOODS:  You can testify about what you've read,
17  and what you've surmised from reading the documents.
18  Q.  (By Mr. Moskowitz)  Okay, good advice.  You said he's a
19  pro in that business, Mr. Bandas, what does that mean?
20  A.  He's a professional just like you are, as a counsel.
21  Q.  Professional in what business?
22  A.  As a counsel.
23  Q.  As a counsel.  Do you know his experience in lender
24  place insurance cases?
25  A.  Not really.

**31**

1   Q.  Do you know if he's ever litigated a lender place
2   case?
3   A.  I've dealt with him on one case that is.
4   Q.  I'm sorry?
5   A.  He has handled my case, more than one case, that's.
6       MR. WOODS:  The CertainTeed case?
7   A.  Right, the other type of case.
8   Q.  (By Mr. Moskowitz)  But do you know if he's ever done a
9   lender place insurance case?
10  A.  I haven't read up on everything.
11  Q.  Have you talked to him and have you understood him to
12  have ever litigated a lender place insurance case?
13  A.  No.
14  Q.  Do you know if he has retained any experts?
15  A.  From what I see now, yes, he could have hired experts,
16  yes.
17  Q.  In lender place insurance?
18  A.  In this particular case.
19  Q.  Who?
20  A.  This particular case like Wells Fargo case.
21  Q.  Right, you say he did or?
22  A.  He must have.
23  Q.  Why?
24  A.  Because the why I mean, you know, because you need
25  professional expertise in every area, I mean.

**32**

1   Q.  Do you know a person's name that he's hired?
2   A.  Yeah, from what I gather, his name is Santiago Cueto
3   C-U-E-R-T-O.
4   Q.  Santiago Cueto.
5   A.  Cueto and the other one is Ted Frank who drafted
6   that -- who was the brain behind writing all that thing.
7   Q.  Okay.  Are those lawyers, do you know?
8   A.  One is a lawyer.
9   Q.  Which one?
10  A.  Santiago.
11  Q.  Santiago Cueto?
12  A.  Cueto.
13  Q.  And he's a lawyer?
14  A.  Yeah, he's a lawyer.
15  Q.  And he's an expert?
16  A.  Once again, I'm depending on Chris Bandas to do all
17  the work.
18  Q.  Is Mr. Cueto your lawyer?
19  A.  No, he's representing me okay.
20  Q.  Do you have an agreement with Mr. Cueto?  You know we
21  looked at composite Exhibit 1 with four agreements, do you have
22  any written agreements with Mr. Cueto?
23  A.  No.
24  Q.  Do you have any written agreements with Mr. Frank?
25  A.  No.

**33**

1   Q.  But both are your lawyers?
2   A.  Both of them are my lawyers because general counsel,
3   Chris Bandas is my general counsel and he hired to represent me
4   in those cases.
5   Q.  Do you know if there's an agreement between Mr. Bandas
6   and Mr. Frank?
7   A.  Could be.
8   Q.  But you don't know?
9   A.  I don't know.
10  Q.  Have you ever talked to Mr. Frank?
11  A.  No.
12  Q.  Have you ever talked to Mr. Cueto?
13  A.  No.
14  Q.  Have you ever had any conversations with Mr. Frank or
15  Mr. Cueto, whether on the phone or an e-mail or a letter?
16  A.  No.
17  Q.  You've never had any contact with them?
18  A.  No.
19  Q.  Do you know how they're getting paid in this matter?
20  A.  No.
21  Q.  Do you know what the legal claims are that were
22  asserted in the Wells Fargo or SunTrust cases?
23  A.  What do you mean by legal claim?
24  Q.  What the claim was, the cause of action?
25  A.  $21 million.