# Exhibit 5

## Declaration of Theodore H. Frank
## in Support of Motion to Intervene

1.      My name is Theodore H. Frank, and I have personal knowledge of the matters attested to in this declaration.

2.      I am the lead appellate counsel for appellant Jeffrey Collins in Appeal No. 15-1546, and the attorney who signed and filed the joint brief of appellants in Appeal Nos. 15-1400, 15-1490, and 15-1546, challenging the Rule 23(h) award to class counsel in this case.

3.      I had a telephone conversation after business hours on Friday, June 5, 2015, with Jonathan Selbin of class counsel Lieff Cabraser. In that conversation, he made Mr. Collins a settlement offer where Mr. Collins would dismiss his appeal and withdraw his pending fee petition in the district court, and class counsel would pay Mr. Collins $25,000 upon those two things happening. Based on my understanding of earlier communications with my client (including, but not limited to, Mr. Collins's retainer agreement; Mr. Collins's declaration under oath in the district court; and Mr. Collins's emails to me of November 19, 2014; March 25, 2015; May 11, 2015; May 27, 2015, at 7:48 AM Central; and June 4, 2015 at 7:35 AM Central), I declined that offer. Mr. Selbin repeated his offer in writing in an email, and threatened to subpoena Mr. Collins in the district court. In further communications between me and Mr. Collins on June 5, Mr. Collins indicated to me that he now wished to accept the offer notwithstanding his earlier agreement and statements, and I wrote Mr. Selbin on June 5 to indicate that Mr. Collins accepted the offer.

4.      Pursuant to that settlement, I separately filed on Mr. Collins's behalf a motion to dismiss in the form requested by class counsel on Monday, June 8, 2015, and Mr. Collins withdrew his pending fee petition in the district court on June 9, 2015; class counsel then wired $25,000 to Mr. Collins. I find the settlement agreement between Mr. Collins and Mr. Selbin repugnant, and have a fundamental disagreement with Mr.

1

Collins's decision to accept the settlement offer. Ethical rules required me to communicate that settlement offer to Mr. Collins and to permit him to accept it; moreover, Mr. Collins would have been prejudiced by my withdrawal, given the short time-frame he had to accept the offer, so I filed the motion to dismiss instead of withdrawing. The Court has granted Mr. Collins's motion to dismiss and issued a mandate in Appeal No. 15-1546.

5.      Mr. Selbin's written offer made clear that the offer to Mr. Collins is contingent only upon the dismissal of Mr. Collins's appeal no. 15-1546, and no other appeal. The Center for Class Action Fairness's motion to intervene in Appeal Nos. 15-1400 and 15-1490 as guardian ad litem for the class thus presents no conflict of interest with Mr. Collins.

6.      Because its retainer agreement complies with conservative interpretations of federal guidelines for non-profit public-interest law firms, the Center for Class Action Fairness has no rights to any of the $25,000 Mr. Collins has received for settling his appeal. It thus has no conflict of interest with the class in agreeing to the dismissal of Mr. Collins's appeal, while opposing any dismissal of Appeal Nos. 15-1400 and 15-1490.

7.      In my opinion, the merits brief filed in Appeal Nos. 15-1400, 15-1490, and 15-1546, challenging the fee award and violation of Rule 23(h), is meritorious, and has a substantial chance of success that will improve the class outcome. The class will be unfairly prejudiced if the appellants in No. 15-1400 and No. 15-1490 are also permitted to dismiss their appeals after Mr. Collins dismisses his appeal. In addition, I believe that the Seventh Circuit's decision in Appeal Nos. 15-1400 and 15-1490 is "an opportunity to provide additional guidance to the district court" in a "common and economically significant" scenario.

8.      I believe the settlement satisfied Rule 23(e) at the time it was made and approved, and do not believe the class will be unfairly prejudiced if settlement approval is affirmed.

2

### Theodore H. Frank and the Center for Class Action Fairness

9.     I graduated the University of Chicago Law School in 1994. I am a member of the Illinois, California, and District of Columbia bars; a former clerk for a judge on the U.S. Court of Appeals on the Seventh Circuit; and an elected member of the American Law Institute.

10.     I founded the Center for Class Action Fairness in 2009. It is a 501(c)(3) non-profit public-interest law firm, with its attorneys based out of Washington, DC.

11.     The goal of the Center is to protect class members in the class action settlement process from certain abuses of the class action system. The Center's attorneys have won class members millions of dollars and have received national acclaim from the press. *See, e.g.*, Adam Liptak, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. TIMES (Aug. 13, 2013) (calling me "the leading critic of abusive class action settlements"); Jeffrey B. Jacobson, *Lessons From CCAF on Designing Class Action Settlements*, Law360 (Aug. 6, 2013) (discussing the Center's recent track record); Ashby Jones, *A Litigator Fights Class-Action Suits*, WALL ST. J. (Oct. 31, 2011).

12.     I have won over a dozen appeals on behalf of class members. I have argued before the Seventh Circuit three times in cases related to class action or shareholder derivative settlements on behalf of the Center, and won all three cases. *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014) (observing that CCAF "flagged fatal weaknesses in the proposed settlement" and demonstrated "why objectors play an essential role in judicial review of proposed settlements of class actions"); *Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014); *Robert F. Booth Trust v. Crowley*, 687 F.3d 314 (7th Cir. 2012). In addition, I was retained in my private capacity by Christopher Bandas to ghostwrite the briefs and successfully argue *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014).

13.     Other courts have also praised the Center's work. *In re Dry Max Pampers Litig.*, 724 F.3d 713, 716-17 (6th Cir. 2013) (describing CCAF's client's objections as

3

"numerous, detailed, and substantive."); *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 205 (D.D.C. 2013) (describing CCAF's client's objection as "comprehensive and sophisticated" and noting that "[o]ne good objector may be worth many frivolous objectors in ascertaining the fairness of a settlement."). Through its efficient work as a watchdog, the Center has won class members millions of dollars. *See, e.g., McDonough v. Toys "R" Us*, No. 06-cv-00242, 2015 U.S. Dist. LEXIS 7510, at *141 ("CCAF's time was judiciously spent to increase the value of the settlement to class members") (internal quotation omitted); *In re Classmates.com Consol. Litig.*, No. 09-cv-0045-RAJ, 2012 U.S. Dist. LEXIS 83480, at *29 (W.D. Wash. Jun. 15, 2012) (noting that CCAF's client "was relentless in his identification of the numerous ways in which the proposed settlements would have rewarded class counsel ... at the expense of class members" and "significantly influenced the court's decision to reject the first settlement and to insist on improvements to the second").

14.     CCAF receives many more requests to bring meritorious objections to class actions and excessive fee requests than it has resources to pursue, and thus has no interest in wasting resources bringing an objection it does not believe is legally meritorious.

### The Center for Class Action Fairness and Professional Objectors

15.     Because CCAF is non-profit, it cannot and does not settle its objections for a *quid pro quo* cash payment to withdraw, as many professional objectors do.

16.     CCAF's clients would sometimes be co-appellants with so-called "professional objectors." In CCAF's early years, several professional objectors would become very angry with me when I would refuse to engage in settlement negotiations or accept payment to dismiss appeals.

17.     In a 2010 case, I represented a client with a meritorious Ninth Circuit appeal of approval of a settlement where the attorneys received $4 million and the class received zero. The appeals court ordered mediation, though I indicated to the mediator

4

that my clients did not want to settle. After we filed our opening brief, class counsel offered an extraordinary sum to my clients to dismiss their appeals. (Unfortunately, the offer was confidential, and I cannot disclose it absent a court order.) One of my clients, an attorney friend, apologetically indicated that the offer was too good to refuse. I withdrew as attorney for the two appellants, and they settled and dismissed the appeal. Neither the Center nor I received any compensation as part of that settlement.

18.    Since that time, the Center's retainer agreements contain multiple clauses relating to the motivations of the Center's clients and the possibility of settling objections for money. Among other provisions, the Center discloses that retaining the Center might deprive clients of the most financially advantageous outcome; clients promise that they are not seeking to settle their objections for money; and clients authorize the Center to move for an injunction prohibiting them from doing so. The Center also very carefully screens its clients to ensure their good faith in objecting and, when possible, uses Center attorneys or board members who are class members to object. We do not represent clients who do not agree to these terms.

### My Former Business Relationship with Mr. Bandas

19.    Christopher Bandas regularly represents clients who object to class action settlements. In 2012, both Mr. Bandas and I represented clients in a Third Circuit appeal. Mr. Bandas, unlike other professional objectors I had dealt with until then, cooperated with the Center's goals, did not complain about the Center's refusal to settle, joined the Center's brief with a Rule 28(i) letter instead of filing a separate brief that would distract the appeals court from the issues the Center wished to raise, and did not demand oral argument time. That appeal, *In re Baby Products Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013), was successful, and I greatly appreciated Mr. Bandas's cooperation.

20.    While the appeal was pending. Mr. Bandas telephoned me and praised my work and the work of the Center, and I was flattered. He asked if there was any way I could perform legal work for him.

5

21.    I was intrigued by the possibility. At the time, I was an independent contractor with the Center's then-parent § 501(c)(3) charity. I had been frustrated by the work of other objectors, who would make substandard arguments or otherwise waive the best arguments, and then lose appeals or district-court cases that would then create bad precedents that hurt the Center's work. And the Center was poorly funded and thinly staffed, so we were not able to object in many cases where we wished to represent clients or appeal in all the cases we wished to appeal. If I was able to brief and argue those non-Center cases instead, I could further the Center's goals. Furthermore, Mr. Bandas suggested that his contacts with other professional objectors could help the Center in cases with multiple objectors. Moreover, Mr. Bandas, along with Darrell Palmer, had recently won a Ninth Circuit appeal, *Dennis v. Kellogg*, so I believed him when he indicated that he was interested in the development of good case law. Finally, the supplemental income Mr. Bandas was paying me would permit me to take a pay cut from the Center, and use that money to hire an additional Center attorney.

22.    Mr. Bandas persuaded me that he was only agreeing to settle objections for money because courts failed to provide adequate compensation for successful objectors, and the settled and withdrawn objections were paying for the cases where he was successful but received nothing. My experiences with the Center where the Center often received nothing for successful objections, and had even our modest requests for fees reduced by district courts that would rubber-stamp much larger class counsel requests, were consistent with that, so I believed him: he was correct that settling objections for money was much more profitable than bringing successful objections. For example, though Mr. Bandas's and Mr. Palmer's *Dennis v. Kellogg* appeal was successful and resulted in material improvement in the settlement, the district court refused to award attorneys' fees to the objectors.

23.    Mr. Bandas's proposal thus seemed win-win-win-win: Mr. Bandas would be better off, the law of class action settlements would be better off, the Center would be

6

better off if I took a pay cut and if I won precedents on behalf of Mr. Bandas's clients, and I would be better off. (I did take a pay cut, and the difference largely paid for a junior attorney to work for the Center for a little over a year.)

24.     After receiving internal approval from the Center's Board of Directors and other Center attorneys, I agreed to consult with Mr. Bandas, subject to some ground-rules: (1) I would only work on objections that I believed to be meritorious; (2) I would only work on cases where the Center did not have a client and where independent Center attorneys agreed in advance that there was no conflict of interest; and (3) Mr. Bandas would not claim at any time that my work for him was being done by the Center for Class Action Fairness. I would only make appearances in cases where there was no prospect of settlement, and if a case settled after I made an appearance, I would be permitted to withdraw as counsel.

25.     My first assignment with Mr. Bandas was an expert report in a district-court case where I was paid by the hour.

26.     Mr. Bandas proposed that I receive a contingent fee of a share of the proceeds of settled objections in cases where I performed consulting. I at first agreed to this, subject to the exception that, if I provided expert testimony, I could not receive contingent payment and would need to be paid by the hour. However, I grew uncomfortable with receiving a percentage of settled objections, both because I disagreed with the idea of settling objections for money at the expense of the class, and because I was concerned that I was most often being consulted in difficult cases where Mr. Bandas's actions before I became involved was putting him at risk of sanctions and where payment was thus unlikely. In 2013, Mr. Bandas and I agreed to a set of new retainer agreements where I would be paid by the hour, subject to a monthly minimum payment, with separate payments and separate retainers for cases where I made an appearance on behalf of one of Mr. Bandas's clients. The contingent payments I had received to date would be retroactively treated as a partial payment in advance for my

7

appearance and argument in a Seventh Circuit appeal, *Eubank v. Pella Corp.*, where I had written final drafts of the briefs. I declined assignments from Mr. Bandas where I did not think the settlement or fee request was objectionable, or where I had a conflict of interest, and, until this case, Mr. Bandas did not complain.

27.    I regularly gave oral reports to and answered questions from the Center's Board of Directors about my outside consulting and legal work, how it was consistent with the Center's mission, and what I was doing to avoid conflicts of interest. Subject to their satisfaction with these reports, the Center continued to approve my outside work.

28.    While Mr. Bandas paid me much less than the written agreements anticipated, I was generally satisfied with the business arrangement because I was not especially interested in the money. I got to brief and argue interesting cases where the Center did not have the resources or the clients to participate in. The objectors prevailed in *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014), and that was useful precedent that the Center cited in its cases. I took a paycut from the Center and the Center used the savings to hire expert witnesses and attorneys to bring more ambitious objections. Mr. Bandas helped wrangle objectors in other CCAF cases to reduce cacophony in oral arguments, and, until this case, did not interfere with CCAF cases or clients. I understood that my pay from Mr. Bandas was made possible and would not have occurred without Mr. Bandas profitably settling cases where I was not counsel of record, but rationalized accepting that money because of the benefit to caselaw of victories like *Eubank* that might not have occurred if I was not assisting Mr. Bandas.

29.    Mr. Palmer also retained me on behalf of five objectors to brief and argue two Fifth Circuit appeals that I believed (and still believe) meritorious, but three of those objectors fired him and me mid-appeal, and the other two chose to dismiss their appeals rather than proceed and risk sanctions in a pending Rule 11 motion in the district court for "filing a frivolous appeal." (For what it's worth, the argument class counsel made for why the appeal was "frivolous" was a claim that the objectors did not

8

have standing to object to settlement approval, an argument that the Seventh Circuit itself called frivolous in *Eubank v. Pella Corp.*) Mr. Palmer did not pay me any of the amount agreed upon in the retainer, or reimburse me for my expenses, and I have not pursued him for it.

30.    I grossed about $33,000 from Mr. Bandas in 2013, $125,000 in 2014, and $95,000 between January 1 and June 4, 2015; and incurred about $32,000 of expenses on contract attorneys assisting me on my work for Mr. Bandas (with an invoice from a contract attorney yet to come). Mr. Bandas apparently found these profitable sums to pay, because he became very upset when I terminated my business relationship with him.

31.    My annual pay from CCAF is $199,200; CCAF provides me no benefits. Mr. Bandas indicated to me on numerous occasions, including as recently as June 4, 2015, that I could increase my total income considerably if I quit CCAF and worked for him full-time. Mr. Palmer made me a similar offer in late 2013 or early 2014. I declined both gentlemen's offers.

32.    I terminated my relationship with Mr. Bandas on June 4, 2015, other than, on June 5, 2015, to send him an almost-complete draft of an appeal brief that was due on June 12, 2015.

33.    In May 2015, a reporter contacted me and stated that class action attorneys had complained to him that "bad" objectors who settled cases for money were using my name to threaten class counsel into settling. I acknowledged that I had been retained in a number of class action appeals, including *Eubank v. Pella Corp.*, explained the limitations on my willingness to represent for-profit class-action objectors, and noted that that threat only made a difference if the underlying objection was meritorious. I noted the problem that for-profit objectors had because of courts' unwillingness to allow them to collect fees for successful objections; for example, Mr. Bandas has not

9

received any payment for success in *Eubank*. To the best of my knowledge, the reporter decided not to pursue the story.

### Jeffrey Collins Retains the Center, Objects, and Appeals

34.    Jeffrey Collins is a class member in this case.

35.    On August 20, 2014, Mr. Collins emailed me asking for help objecting in this case. We exchanged several emails collecting preliminary information about his class membership and I told him the Center may be interested, and offered to discuss the case with him the next week.

36.    On August 21, 2014, Mr. Collins submitted a *pro se* objection in this matter, Dkt. No. 143.

37.    Around this time, one of the Center's attorneys had a family emergency, and I had two appellate oral arguments the week of September 8, 2014, and a fairness hearing on August 29, 2014. Because of this and the fact that the objection deadline was in October, I did not contact Mr. Collins again until September 4, 2014, or speak with him until September 8, 2014.

38.    Melissa Holyoak and I conducted extensive due diligence on Mr. Collins to ensure he was a class member and could make a claim, to ensure that his motive were consistent with the Center's mission, and to ensure that he understood that class counsel would try to harass him in retaliation for retaining us; interviewing him in total for over an hour.

39.    We offered Mr. Collins a *pro bono* retainer agreement, telling him that our non-profit did not settle objections for money, and if that he was interested in maximizing his financial return, he should not sign the retainer and instead retain a contingent-fee attorney to assist with his objection. The Center would not have accepted the representation if we thought Mr. Collins would settle his objection for money or if he had not agreed that it was not his intent to do so. Mr. Collins's *pro se* objection was to both the settlement and fees; we told him we could only represent him if he limited his

10

objection to class counsel's fee request. Mr. Collins agreed and signed the retainer on
September 12, 2014.

40.     On July 22, 2014, I'd asked a Center attorney, Adam Schulman, to monitor
this case in anticipation of filing an objection on behalf of a class member to what we
expected to be an oversized fee request. Multiple class members in the 17-million-
member class contacted me about the possibility of objecting without any effort on
CCAF's part to find objectors. If Mr. Collins had not retained CCAF, we probably
would have been able to arrange a retainer with another class member to object.

41.     On October 26, 2014, Mr. Collins signed a declaration stating "I bring this
objection in good faith. But if the court has any skepticism of my good faith, I am
willing to stipulate to an injunction forbidding me from settling my objection without
the court's approval." Dkt. 197-1.

42.     The Center retained local counsel, filed a superseding objection on Mr.
Collins's behalf solely to fees, successfully moved for discovery and successfully
compelled compliance with the discovery order, filed multiple rounds of briefing,
fought off a motion for protective order that would have required briefing to be filed
under seal, appeared at several interim hearings relating to discovery, and retained an
expert witness and filed an expert report. Center attorney Melissa Holyoak prepared for
and appeared at a lengthy fairness hearing on behalf of Mr. Collins. Mr. Collins was the
only objector who appeared, through counsel or otherwise, at the fairness hearing.

43.     The objection was partially successful, and the district court reduced the
$22.6 million attorney-fee request of class counsel by about $7 million.

44.     Mr. Bandas also had a client who had objected to the Capital One fee
request. He suggested to me that it would be very lucrative if Mr. Collins or the Center
found a way to decide not to appeal. I thought he was joking (or half-joking), and
reminded him that I had fiduciary duties to the Center, that I could not personally

11

profit from a case the Center was involved in, and that this was a landmark case that the Center was very interested in seeing through.

45.    Mr. Collins was one of six groups of appellants that filed a notice of appeal. His appeal, No. 15-1546, was consolidated with lead appeal No. 15-1400.

46.    Mr. Collins filed his opening merits brief in this Court on May 4. The Center authored that brief. Appellants represented by Mr. Christopher Bandas in No. 15-1400 and Mr. Darrell Palmer in No. 15-1490 joined the brief. Neither Mr. Bandas nor Mr. Palmer contributed to the brief, other than Mr. Palmer confirming for the jurisdictional statement that his clients had filed settlement claims.

47.    On May 14, Mr. Collins filed in the district court a request for attorneys' fees of $160,619, slightly less than the Center's lodestar and about 2.3% of the class benefit, and a request for a $1,000 incentive award to Mr. Collins, each to be paid by class counsel. In advance of that motion, Ms. Holyoak had a telephone conversation with Mr. Collins about it, and sent him a draft for his approval. The parties agreed to stay consideration of the fee petition until the appeal was resolved.

### The *HSBC* Appeal

48.    At the same time the *Capital One TCPA* fee petition was being decided in his court, Judge Holderman also had a pending fee petition for a TCPA settlement in *Wilkins v. HSBC Bank Nevada, N.A.*, No. 14-C-190 ("*HSBC*").

49.    Mr. Collins had also filed a *pro se* objection in *HSBC*, but the Center did not have the resources to represent him in both *Capital One* and *HSBC*, and chose to pursue only one objection on his behalf.

50.    Mr. Bandas and Mr. Palmer had clients who objected in *HSBC*, though they appeared through other counsel. Their clients filed papers in *HSBC* adopting many of Mr. Collins's arguments in *Capital One*.

51.    Antonia Carrasco, the appellant in No. 15-1400, also objected in *HSBC*, and appealed the fee ruling in that case in appeal No. 15-1640. Mr. Bandas filed a notice

12

of appearance in No. 15-1640 on March 27, 2015.

52.    On several occasions in March and April, Mr. Bandas and I discussed the pending *HSBC* appeal and whether I could brief and argue that case. I noted that *HSBC* was likely to be consolidated with *Capital One*, a CCAF case. I cannot personally profit from CCAF's non-profit work under tax law, so I told Mr. Bandas that I could not brief *HSBC*, but that CCAF would be willing to represent Ms. Carrasco under a standard *pro bono* CCAF retainer agreement. I noted that it would be very problematic if Ms. Carrasco settled her appeal after CCAF made an appearance on her behalf, and we would need assurances that that did not happen.

53.    *HSBC* involved many of the same class attorneys as in the *Capital One* appeals, including Mr. Selbin of Lieff Cabraser.

54.    Ms. Carrasco and the other *HSBC* appellants, including Mr. Palmer's client, moved to voluntarily dismiss their *HSBC* appeals on April 22, 2015. This Court granted those motions on April 23, 2015 without comment.

55.    I do not know how much Mr. Selbin and Ms. Carrasco and Mr. Bandas settled the *HSBC* appeal for. Based on Mr. Bandas's conduct, I believe it is a substantial sum, far in excess of the amount offered to Mr. Collins individually to settle his appeal and fee petition, and that it would be informative of how much Mr. Bandas expects to settle Ms. Carrasco's *Capital One* appeal for if there is not already an agreement in place. In the absence of CCAF's motion for intervention, the *Capital One* settlement would have been likely to settle for much more money than *HSBC*, because I do not believe class counsel understood how strong the appellate arguments would be until they saw the briefing on May 4, and because class counsel has a larger fee award at stake in *Capital One* than in *HSBC*.

### Mr. Collins Expresses Discontent

56.    On or about May 26, Mr. Palmer's clients filed in the district court a motion for attorneys' fees of $1,500,000 and a request for a $2,000 incentive fee for each

13

of the two objectors he represented. Neither the Center nor I had any role in or advance notice of Mr. Palmer's fee petition.

57.     On the morning of May 27, Mr. Collins emailed me and two attorneys at the Center about Mr. Palmer's fee request. Mr. Collins had read Mr. Palmer's fee petition before I had.

58.     Ms. Holyoak immediately telephoned Mr. Collins, but he refused to take the call. He emailed Ms. Holyoak and I in response, asked us to take action on his behalf and said that we could contact him on June 3. Mr. Collins did not specify what that action should be.

59.     Immediately after I received Mr. Collins's email, I emailed Mr. Palmer and Mr. Bandas and demanded that Mr. Palmer withdraw his motion for fees, which I believed undermined the arguments Mr. Palmer signed onto on the appeal. Mr. Bandas also emailed Mr. Palmer and made the same request the same day. Ms. Holyoak and I began to make arrangements to file briefs in the district court opposing Mr. Palmer's fee request.

60.     I followed up with a text message to Mr. Palmer the same day. Mr. Palmer offered to modify his motion to satisfy us. Ms. Holyoak ceased preparing papers because we believed Mr. Palmer would be willing to file something consistent with our view of the law, though we were unsure whether Mr. Collins would be satisfied with that.

61.     That night I emailed Mr. Collins about Mr. Palmer's offer and asked for clarification. I followed up with another email on June 1. I received no response from Mr. Collins until June 3.

62.     On June 3, I emailed Mr. Palmer, and proposed a modification to his fee request. He gave an ambiguous response indicating that suggested he agreed, but did not respond to my queries about when and how he would file that modification. As of June 9, he has not filed a modification to the fee petition in the district court, and has not

14

responded to my attempts to contact him since June 5.

63.    Mr. Collins's May 27 and June 3 emails (six in total) were premised on misunderstandings about the Center's authority over Mr. Palmer and the Center's role in Mr. Palmer's fee request. They were also ambiguous. At various times, Mr. Collins both claimed to terminate our relationship and demanded that Ms. Holyoak and I to take actions on his behalf as his attorneys—sometimes in the same email. Ms. Holyoak and I did our best to clarify Mr. Collins's intentions—did he want us to act as his attorneys on his behalf or was he firing us?—a fact complicated by inconsistent and ambiguous instructions, and his refusal to talk to us by telephone.

64.    On June 3, at 2:17 PM, in response to an email asking for clarification, Mr. Collins dismissed us as his counsel. I emailed Mr. Collins on June 3 at 3:47 PM and informed him that we would be filing papers with the court telling the court we had been fired, and explaining to him what the likely consequences of that filing would be and what his options were. On June 3, at 5:34 PM Central, Mr. Collins emailed us and made an ultimatum if we were to continue as his attorneys.

65.    Based on Mr. Collins's six emails of May 27 and June 3, I believed it was likely that either Mr. Collins had terminated or would terminate his retainer with us or that the Center would have to terminate our representation of Mr. Collins. I also believed that there was a chance Mr. Collins would file a complaint with the district court. I had no concern about any truthful complaint Mr. Collins would file, other than the possibility that Mr. Collins's complaint to the court would come before Ms. Holyoak and I notified the appeals and district courts of our withdrawal, and that we would be accused of being less than forthright with the court.

66.    In an internal email I sent to the CCAF Board of Directors and other CCAF attorneys on June 3 at 9:13 PM Central, I notified them of plans to notify opposing counsel on June 4, and to file papers with the Court on June 5 withdrawing as Mr. Collins's counsel and seeking intervention as guardian ad litem for the class. We were

15

under no circumstances going to hide the fact that Mr. Collins had dismissed us if we were reasonably certain he had dismissed us; the only question requiring research preventing filing sooner was what we could and could not disclose to the Court about his ultimatum to us.

67.    On June 3, at 9:00 PM Central, I emailed Mr. Collins. I expressed regret that we declined his ultimatum, explained what we could and could not do on his behalf under the law, what we had and had not done to date, and the status of negotiations with Mr. Palmer about his fee request. I explained that I anticipated that he would be dissatisfied with our response, and offered to file a motion to withdraw as his attorneys, and gave him options as to what that motion would say.

68.    On June 4, at 7:35 AM Central, Mr. Collins emailed us, and indicated that, if we had not already filed papers withdrawing, he wished for the original retainer to remain in effect and to continue with the appeal. I sent Mr. Collins an email on June 4, 2015, at 8:35 AM Central, confirming that he wished to proceed with the appeal, that the original retainer was in effect and we were still his attorneys and he didn't want to fire us, and explaining how we would proceed from here to ensure he was happy with us. Ms. Holyoak ceased drafting motions to withdraw and to intervene.

### I Contact Mr. Bandas and Mr. Bandas Contacts Class Counsel

69.    On June 3, at 2:17 PM Central, I called Mr. Bandas. I explained that our client was probably terminating our representation, and asked if there was a way to negotiate Center representation of Ms. Carrasco so that we could see the appeal through. He said he would have to check with his client. I noted that if Mr. Bandas profited from a dismissal of the appeal that was not in the public interest after CCAF had used non-profit resources to file a brief that he had joined, it would create a tremendous appearance of impropriety that might risk CCAF's non-profit status if I continued to moonlight for him, and that I would have to terminate my relationship with Mr. Bandas to protect CCAF.

16

70.    I further texted Mr. Bandas at 2:56 PM Central on June 3, noting that I would need to make a filing with the Court by Friday morning, and hoped to have an answer by close of business Thursday whether we could represent his client. He responded that it would depend on whether he could get a hold of his client.

71.    The Center hoped it would be uncontroversial to represent an existing appellant, and thus made the inquiry to Mr. Bandas, who had previously been cooperative with the Center's appeals. The plan was to file a motion to withdraw (or announcement of termination) on June 5, and then either make a notice of appearance in 15-1400 or a motion to intervene as guardian ad litem using the *Safeco v. AIG* precedent. We wanted a quick answer from Mr. Bandas so we knew what the motion would say. We did not want to settle the appeal.

72.    According to two June 5 emails from Mr. Selbin, Mr. Bandas contacted a Lieff Cabraser partner "late Wednesday afternoon," (i.e., June 3) and claimed to be representing both his client and Mr. Collins and myself in settlement negotiations. According to Mr. Selbin, Mr. Bandas represented that I had been fired and did not want to disclose that "embarrassing" fact to the Seventh Circuit. As this declaration and motion shows, I am not embarrassed about my representation of Mr. Collins or the fact that Mr. Collins considered firing me.

73.    I texted Mr. Bandas at 8:17 AM Central on June 4 and notified him that Mr. Collins had "unfired" us, and that was no need for the Center to represent his client. I had a 27-minute conversation with Mr. Bandas that morning about the issue and other pending matters; Mr. Bandas indicated that his client wanted to settle, and I reminded him that it was a good thing that Mr. Collins changed his mind, because I would have had to terminate my consulting with Mr. Bandas otherwise if Ms. Carrasco had then settled her appeal for payment to Mr. Bandas.

74.    On June 4 at 4:02 PM Central, Mr. Bandas communicated to me an oral exploding offer of settlement, purportedly from class counsel. Mr. Collins must dismiss

17

his appeal by close of business June 8, 2015, with $25,000 payable to Mr. Collins upon the appeal's dismissal. He suggested that there was a global settlement offer that everyone else had agreed to. He confirmed the $25,000 offer in the passive voice in a text at 4:41 PM Central. The offer mentioned did not include any requirement to dismiss the fee petition. At this time, I texted Mr. Bandas to terminate my separate business arrangement with him. Mr. Selbin confirmed in writing to me on June 5 that Lieff Cabraser did make a global settlement offer to Mr. Bandas; though he wasn't sure when the offer was made, he thinks it was June 4. On information and belief, Mr. Bandas and Mr. Palmer have agreed to settle with class counsel for a substantial sum of money in exchange for dismissing their appeals in Nos. 15-1400 and 15-1490; on June 10, 2015, Mr. Palmer moved to dismiss appeal no. 15-1490.

75.     In the course of several emails and phone calls with Mr. Bandas seeking clarification and documentation on June 4 and June 5, Mr. Bandas represented (1) class counsel would not be willing to put the offer in writing because class counsel was afraid of what I would tell the court; (2) class counsel was not willing to speak with me because they did not trust me not to tell the court; (3) if I was worried that class counsel would renege, $25,000 could be put in my trust account in advance of the motion being filed. Mr. Selbin has asserted to me that the first two claims are false, and he was indeed willing to speak to me and put the offer in writing. I do not recall whether Mr. Bandas's third representation was on behalf of class counsel, on behalf of himself, or spoken in the passive voice to obscure who would be providing the $25,000; Mr. Selbin denies offering advance payment.

76.     I jokingly said to Mr. Bandas that I wondered whether this was a settlement offer coming from him, rather than from class counsel. He became very defensive, but also said that if the offer had been from him, he would have offered $100,000 to make sure there was no chance Mr. Collins would decline the offer. From

18

this statement I infer that Mr. Bandas is being offered at least $200,000, and likely much more, to dismiss his appeal.

77.    I noted to Mr. Bandas that the Seventh Circuit has *sua sponte* refused to dismiss class action settlement appeals twice, and that there might be an investigation, and that the Seventh Circuit could issue an opinion on professional objectors that would threaten his entire business model, and perhaps even issue a *sua sponte* order to show cause why counsel should not be disbarred. This was meant as friendly advice that he wanted to get something in writing from class counsel rather than stick his neck out, lest they claim he was lying about their settlement offer, and the Seventh Circuit investigated, but he apparently took it to be a threat.

78.    Mr. Collins suggested in a June 5 email he would accept the offer if it was in writing. This answer contradicted multiple communications he had previously sent to us, as well as his sworn declaration, so I tried to have a phone call with him, but he indicated he didn't want to discuss the matter further.

79.    One can't file a motion to dismiss without knowing what class counsel's position on costs are, and Mr. Collins also wanted something in writing, so I continued to insist on having something in writing or at least having a conference call with class counsel. In response, Mr. Bandas told me I was "being a baby," and didn't have anything else to say to me. Mr. Bandas's panicked response was the first I truly realized he had misled me, and I noted that now there was going to be an investigation and that the Seventh Circuit was unlikely to dismiss the appeal under these circumstances. Mr. Bandas hung up on me, and then emailed me to say that the offer had been withdrawn.

### Class Counsel Demands Its Offer Be Considered

80.    I left a voice-mail with Mr. Selbin to find out what had happened. In his return phone call to me after business hours on June 5, 2015, he confirmed that he made Mr. Bandas a settlement offer where Mr. Collins would dismiss his appeal and withdraw his pending fee petition in the district court, and class counsel would pay Mr.

19

Collins $25,000 upon those two things happening, and he repeated that offer to me. Based on my understanding of earlier communications with my client (including, but not limited to, Mr. Collins's retainer agreement; Mr. Collins's declaration under oath in the district court; and Mr. Collins's emails to me of November 19, 2014; March 25, 2015; May 11, 2015; May 27, 2015, at 7:48 AM Central; and June 4, 2015 at 7:35 AM Central), and my understanding of existing law, I declined that offer. Mr. Selbin asked me if I was still Mr. Collins's counsel. I said I was. Mr. Selbin asked me if there was a time when we did not represent Mr. Collins. I admitted that Mr. Collins had considered firing us, but did not.

81.      Mr. Selbin repeated his offer in writing in an email, and threatened to subpoena Mr. Collins in the district court. In further communications between me and Mr. Collins, Mr. Collins indicated to me that he now wished to accept the offer notwithstanding his earlier agreement and statements. Research indicated that legal ethics rules required me to accept an unethical settlement offer, notwithstanding the retainer agreement and my reliance upon it and Mr. Collins's declaration under oath, and I wrote Mr. Selbin to indicate that Mr. Collins accepted the offer.

82.      I noted to Mr. Selbin that his offer to Mr. Collins was unethical. He responded in writing that "I would be happy for every aspect of this to be reviewed by the Seventh Circuit or District Court, as we have done absolutely nothing wrong."

83.      In response, I asked Mr. Selbin to disclose what Lieff Cabraser had offered Mr. Bandas to settle his appeal in this matter. Mr. Selbin refused to disclose that information to me. On information and belief, it is a substantially larger sum than Mr. Collins has been paid.

84.      I relied upon Mr. Bandas's promise not to interfere with CCAF cases, and believed he would adhere to that promise here once I rejected his proposal to pay me to not appeal. Mr. Collins had authorized the Center to move for an injunction barring alienability of appeals and objections. Had I known Mr. Bandas would actually take

20

steps to undermine Mr. Collins's appeal, I would not have confided in Mr. Bandas, and the Center would have sought an injunction at an early stage of the proceedings to "tie the sailors to the mast."

### Communications with Mr. Collins

85.    Over the course of the district court proceedings, class counsel and defendant made numerous filings that referred to Mr. Collins and to pending objections. Melissa and I had numerous communications with Mr. Collins regarding those filings. Throughout the process, Melissa and I ran drafts of proposed filings by Mr. Collins, who occasionally made suggested changes.

86.    Mr. Collins and I exchanged a number of emails about the fact that two other appellants joined our brief and what that meant.

87.    On May 11, 2015, Mr. Collins sent me and other Center attorneys an email relating to press coverage of a Ninth Circuit decision and about his goals and motives for proceeding with the appeal.

88.    Ms. Holyoak and Mr. Collins exchanged emails on May 12 and May 13 about the Center's request for fees.

89.    While the appeal was pending, Darrell Palmer, counsel for Vanessa FV VanWieren and Mary Smith Tweed, filed a motion for $1.5 million in attorneys' fees and $2,000 in objector incentive payments. Ms. Holyoak and I had numerous communications with Mr. Collins regarding those requests. Mr. Collins refused to speak on the phone with us about the issue.

90.    On June 3, 2015, I had an exchange of emails with Mr. Collins where he gave me a take-it-or-leave-it ultimatum about proceeding with the appeal. Based on that ultimatum, I proposed to Collins a motion for the Center to withdraw as his counsel.

91.    On June 4 and 5, 2015, I had numerous emails with Mr. Collins regarding Mr. Bandas's oral settlement offer, Mr. Selbin's written settlement offer, Mr. Selbin's threatened subpoena, what other appellants were likely receiving to settle the case, and

21

the possibility of enhanced court-ordered incentive payments to compensate Mr. Collins for turning down settlement offers if he prevailed on appeal. Mr. Collins refused to speak on the phone with us about the issue.

92.     These communications all provide relevant insight into why Mr. Collins dismissed his appeal, why Mr. Collins settled, why the Center thought Mr. Collins did not want to settle, why the Center thought it might be (or might have been) fired, and why the Center has acted as it did. However, I do not have authority to disclose these privileged attorney-client communications except *in camera* under a court order.

93.     To this day, I don't know whether Mr. Collins thinks he fired CCAF on May 27, on June 3, or not at all, or whether he thinks CCAF did something wrong. Mr. Collins does not want to discuss the case anymore, does not want to make decisions relating to the case, and continued to give me instructions on how to act as his attorney as late as June 5, but has not answered follow-up questions and has refused to speak to me and Ms. Holyoak on the phone. I am following my client's June 5 instructions to the best of my ability (which he would have no authority to give me if I had been fired earlier) to protect his latest stated wishes, but even those instructions are ambiguous.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

Executed on June 10, 2015, in Washington, DC.

Theodore H. Frank

22